## FIRST NATIONAL BANK v SCIOTO BANK

Ohio Appeals, 2nd Dist, Madison Co

No 117. Decided April 15, 1936

H. H. Crabbe, London, James M. Butler, Columbus, Claude J. Bartlett, Columbus, Phil S. Bradford, Columbus, and James W. Huffman, Columbus, for plaintiff in error.

Frank J. Murray, London, Smith W. Bennett, Columbus, and Hugh W. Bennett, Columbus, for defendant in error.

## OPINION

By HORNBECK, J.

Error is prosecuted from a judgment in behalf of defendant in error, who was the plaintiff below, against the plaintiff in error, who was the defendant below. The parties will be referred to as they appeared in the trial court.

The pleadings are extended but the issues simple and were drawn on the claim of the plaintiff, that the defendant had, through its agent and officer, Charles R. Mayers, President, sold certain bonds to plaintiff and agreed to repurchase them. The sales were made on two occasions on the same day, namely, December 31, 1913. The subject matter of the sales was five bonds, Nos. 39 to 43, inclusive, of Sub-drainage District No. 1 of the Gueydan Drainage District, State of Louisiana, of the principal sum of $1000.00 each, bearing 5% interest, payable on May 1 and November 1 of each year, beginning November 1, 1913, three of said bonds maturing May 1, 1930 and two maturing May 1, 1931, and also five bonds Nos. 219 to 223, inclusive, of Sub-drainage Disrict No. 1 and the Upper Terrebone Drainage District, Parish Terrebone, in the State of Louisiana, each of the principal sum of $1000.00, bearing interest at 5%, maturing on August 1, 1936, interest payable February 1 and August 1 of each year, beginning August 1, 1913

The plaintiff bank, at the time of the transactions herein considered, for many years prior and many years subsequent thereto, had been a depositor with the de-

fendant bank. Upon the purchase of the bonds the defendant charged the sale price of the bonds to the account of the plaintiff with the defendant. At the time of the sales certain instruments of writing, marked in the record plaintiff's exhibits A and B, were prepared upon the instruction of Mr. Mayers, signed by him and delivered to John Peters, President of the plaintiff bank, and W. E. Lamb, cashier of said bank, at the office of the defendant. The bonds were placed in an envelope in the name of the plaintiff and kept with the defendant.

Plaintiff's exhibit A is upon a statement blank of defendant and is as follows:

"Chas. R. Mayers, Prest.
"Albert D. Heffner, Vice-Pres.
"Chas. R. Shields, Cashier
"Henry Pausch, Jr., Asst. Cashier
"Edgar L. Abbott, Asst. Cashier
   THE NEW FIRST NATIONAL BANK
            Columbus, Ohio
BOND DEPARTMENT       Capital $500,000
                          Surplus $400,000
The Scioto Bank
      Commercial Point, Ohio
1913
Dec. 31st.
TERREBONE  PARISH,  LOUISIANA  5's
Due Aug. 1st, 1935 $2,000
Due. Aug. 1st, 1935   3,000

            5,000 @ 94.50 $4,725.00
Acct. Int. Aug. 1st to Dec. 31st,
   5 months @ 5%              104.17

                             $4,829.17
Nos.

"Referring to the sale of the above described bonds, it is expressly understood that we will credit your account with the face value of these bonds at any time from date of purchase to date of maturity, at a rate of interest not to exceed 5%.

                "Chas. R. Mayers, Prest."

Plaintiff's exhibit B is identical in form with plaintiff's exhibit A, except that the bonds set forth are the Vermillion Parish bonds (also known in the record as Gueydan bonds) and the sum total of the purchase price with interest was $4766.67. Some interest was paid on the bonds as they matured but the last payment of interest on the Vermillion bonds was on May 1, 1922 and on the Terrebone bonds on August 1, 1925.

Plaintiff avers in its petition that the bonds were sold to it upon a written agreement, by the terms of which the defendant

bank agreed, at any time prior to their maturity, to repurchase the bonds at their face value, with interest at 5%. In November, 1926, the plaintiff tendered the bonds to the defendant and requested compliance with the repurchase agreement. On the 15th of January, 1927, the defendant refused to comply with the request.

Upon the factual issue the defendant denies any single written agreement as alleged; that plaintiff's exhibits A and B constitute repurchase agreements . and claims, further, that they were agreements to lend. at any time prior to the maturity of the bonds, sums of money to the plaintiff up to the face value of the bonds, upon which loans there was to be a charge of no* to exceed 5% interest, and that the Terrebone bonds and the Vermillion bonds would be accepted as collateral to secure the loans.

Testimony was taken touching the circumstances under which the bonds were purchased by a committee composed of John Peters. President and W. E. Lamb, Cashier, representing the plaintiff, what was said by them and each of them to Mr. Mayers at the time of the purchases and what was done respecting loans made by defendant to plaintiff after the purchase of the bonds.

The answer of the defendant consisted of five separate defenses, four of which were held insufficient on demurrer and a sixth defense was later urged, setting up the Statute of Frauds.

The cause came on for trial to court and jury. At the conclusion of all the testimony each of the parties made a motion for a directed verdict. The court then discharged the jury and upon the motion of the defendant that in the event the finding was for the plaintiff separate findings of law and fact should be returned, the trial court returned its finding for the plaintiff, together with its separate findings of law and fact. Motion for new trial having been duly filed and overruled, judgment was entered on the verdict.

The briefs of counsel are voluminous and the legal questions presented so numerous that it would be impracticable to undertake to consider them in detail within the limits of this opinion. We have given due consideration to the questions urged, the authorities cited, and the respective arguments of counsel.

The brief of counsel for defendant sets forth the claimed errors under five major headings, as follows:

"1. The court erred in admitting in evidence and considering plaintiff's exhibit A and plaintiff's exhibit B.

"2. The court erred in admitting and considering plaintiff's exhibits A and B, any parol evidence in respect to plaintiff's exhibits A and B, and in respect to the single repurchase agreement alleged, in view of the Statute of Frauds provision in the Ohio Sales Act.

"3. The court erred in finding that Charles R. Mayers as President of the 'First National' had any authority from the defendant to enter into, execute and deliver to the plaintiff on the defendant's behalf any alleged contract of repurchase.

"4. The court erred in finding that the plaintiff had stated and proved a cause of action upon its alleged written contract.

"5. The court erred in its finding and construction of the terms of the 'credit' provision contained in plaintiff's exhibit A and in plaintiff's exhibit B."

We find that no prejudicial error intervened in the trial of this cause to the defendant in any , of the technical errors claimed. The question in this case which gives us most concern is found in the fourth claim of error, as it relates to the weight of the evidence touching the effect of plaintiff's exhibits A and B. The parties undertook to set forth their agreements in plaintiff's exhibits A and B, but they are certainly indefinite and uncertain in meaning. It, therefore, became proper for the trial court to consider extraneous circumstances which might be of assistance in divining the true purpose of the parties.

The plaintiff bank was a small institution, operating in a village. Its officers and directors were not widely experienced in banking business. Upon the organization of the plaintiff bank it immediately associated itself with the defendant bank, carried the greater part of its funds with said institution, depended upon its officers for advice and assistance, and it was but the natural result of the mutual dealings that when the plaintiff had some $10,000.00 to invest it would transact this business with the defendant bank. It is very difficult, indeed, to understand why Mr. Mayers would have employed the language found in plaintiff's exhibits A and B, whether the transactions were to the effect that the defendant bank would repurchase the bonds or that it would lend money upon the security of the bonds.

The draftsmen of the agreements, plaintiff's exhibits A and B, as well as plaintiff's agents, fully understood the meaning of the word "sale" and employed it at the very inception of the agreement in the language: "Referring to the sale of the above described bonds." That which follows, "it is expressly understood that we will credit your account with the face value of these bonds," could have application alike to a repurchase agreement or to a loan agreement, by the terms of which the bonds would be accepted as collateral for the loan. That part of the contracts at the end thereof, "at a rate of interest not to exceed 5%," is a most unusual expression to employ if it were meant that the defendant bank was to repurchase the bonds. It is an expression which is commonly employed in connection with interest to be paid by a borrower to a lender and its use would not be customary or usual in a repurchase agreement. In our judgment this expression lends much support to the claim of the defendant that it fixed a basis of a rate of interest which the plaintiff was to pay to the defendant bank upon borrowed money, secured by the bonds as collateral. It is unusual and we believe not satisfactorily explained in this record, that if the parties were making a definite repurchase agreement there would be an indefinite and uncertain amount of interest which was to be paid if the bonds were repurchased. The fact that the rate of interest was not fixed but was to be not more than 5% is consistent with the theory of a loan and inconsistent with a repurchase. All in all, the instruments, within their own confines, tend more strongly to support the construction claimed by the defendant bank, that they were agreements to loan money on the bonds as collateral in a sum equal to the face amount thereof and for which a rate of interest to be agreed upon by the parties was to be charged, in no event to exceed 5%.

The rule that a written instrument shall be construed strictly against the person who prepares it is of little benefit in the situation here presented.

Analyzing the course of conduct of the parties, again we are impressed with the fact that that which was done by the representatives of the parties is more consistent with the claim of the defendant than that of the plaintiff. The Vermillion bonds defaulted on November 1, 1922. There was no tender back of the bonds until November 19, 1926. There was default in all of the bonds, represented by plaintiff's exhibits A and B, prior to November, 1925. $10,000.00, together with the interest which was due on these bonds if the agreements were as contended for by the plaintiff, was a substantial sum and it cannot be conceived but that its loss must have created consternation and concern among the directors and officers of the plaintiff bank. Mr. Beckett went with the bank in 1918 as its assistant cashier, was promoted to its cashier in 1922, practically operated the bank and was fully cognizant of plaintiff's exhibits A and B and the material facts surrounding them. He states that they were the subject of conversation among those connected with the bank. Yet, in the face of this condition, with the written instruments now claimed to be repurchase agreements in his possession after the bonds had defaulted, this cashier filled out a formal written report to a National Bank examiner, as of the date of the close of business of the bank on November 11, 1925 and said that the Scioto Bank had no repurchase agreement with the defendant bank. This question and its heading was plain and must have put Mr. Beckett on notice of its purport and meaning. It is more consistent with probabilities that the cashier did not consider plaintiff's exhibits A and B as contracts binding the defendant to repurchase $10,000.00 worth of bonds than it is to believe that it was purely carelessness which explains his answer in the written report to the examiner.

The conduct of the defendant bank, through its officers and agents, throughout the years is not inconsistent with its claim that plaintiff's exhibits A and B were merely agreements to loan on the bonds as collateral. Of the loans which were made subsequent to the purchase of the bonds the great majority of them, where the bonds were used as collateral, were made at a rate of interest not to exceed 5%. One instance appears in which the interest charged seemed to be greater but upon explanation it is disclosed to have been for 5%. Some of the loans carried a rate of interest in excess of 5%.

It also appears that after the Vermillion bonds had defaulted there were no further loans made to the plaintiff bank upon the sole security of the bonds. But it does not appear that the plaintiff bank at any time asserted its right to require the defendant bank to comply with its agreements, by the terms of which it was obligated to loan to the plaintiff bank upon the sole security of the bonds, at a rate of interest not to exceed 5%.

The written agreements were in the possession of the plaintiff bank. The personnel of the defendant bank was changing. It was a large institution and it is not improbable that those who were in charge of defendant's bonding department during the time that many of the loans were made to the plaintiff were not familiar with the terms of the agreements, nor does it appear that at any time prior to the formal demand for repurchase of the bonds in November, 1926, the written agreements were ever brought to the attention of the defendant, either for the purpose of demanding a repurchase or for the purpose of insisting upon loans upon the sole security of the bonds. In this situation we cannot say that the defendant bank is chargeable with a course of conduct which did not recognize the written agreements to be that which they now claim them to be.

Although we are of opinion that the trial court was correct in holding that the president of the defendant bank was within the scope of his authority if he, on behalf of the bank, agreed to repurchase the bonds, yet the agreements which are charged to him are most improbable. By the terms of these agreements the defendant bank was obligated, if the bonds were tendered, to repurchase them the next day after the sale at a marked appreciation over the price at which they were sold.

The original petition charged that as an inducement to the purchase of the bonds the agent of the defendant bank represented that their payment was assured by the State of Louisiana. They bore a substantial rate of interest. It was Mr. Peters' purpose, according to his testimony, first, to purchase bonds which were secure and, second, that would yield a substantial rate of interest. He says nothing whatever about any repurchase agreement and though it might be but an abundance of precaution to further determine that the State of Louisiana was assuring the payment of the bonds, it would be somewhat inconsistent for him to rely upon this assurance if, in addition thereto, the defendant bank was agreeing to repurchase the bonds at any time prior to their maturity.

Though there is no legal inconsistency in the pleadings of fraud in the sale of the bonds, upon which part of the petition is grounded, and the claim of written agreements to repurchase. this averment of fraud in the particular asserted in connection with the development of proof is a straw tending to support the claim that there was no contractual agreement to repurchase. In this connection we revert to the claim of the defendant bank that there is a failure of proof of the averment of the petition that plaintiff's right to recover is based upon a single agreement instead of an allegation setting up the two written contracts. Although we have heretofore said that we would not disturb this verdict upon this claim, there is much merit in the contention and we hold as we do solely upon the authority of the statute, §11364 GC, which provides in part:

"In every stage of an action, the court must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party."

There still remains much doubt if pleading the one agreement and proving two does not affect the substantial rights of the defendant.

Clearly, the cause of action of the plaintiff as it eventually was presented to the jury, was predicated upon two separate written agreements entered into the same day, it is true, but at different times. However, the defendant was not mislead as to the nature of the proof and the petition can be amended to conform to the proof at any time, even in this court. But the failure of the petition to set forth the causes of action of the plaintiff upon the contracts upon which the judgment of the trial court was predicated, lends support to the theory that the plaintiff was relying, at the inception of this case, upon the charge of fraud, in which event the contracts were but an incident and a part of the fraudulent transaction set up. When the proof failed to support the claim of fraud, then, of course, the plaintiff was relegated to the case that was made upon the written instruments.

The position taken by the plaintiff by the averments of the petition further supports the claim of the defendant that the written agreements as such do not constitute contracts of repurchase.

It is not necessary to set out at length the testimony of Mr. Peters and Mr. Lamb. Suffice to say that there is but one statement in the evidence of these witnesses which is inconsistent with the position of the defendant in this cause. This statement is found in the testimony of Mr. Lamb on page 51 of the record:

"Q. Mr. Lamb, we will ask you to tell the jury what you may have told to Mr. May-

ers, if anything, at the time during the Christmas holidays in December, 1913, about your authority from the Scioto Bank to purchase these bonds?

A. We told Mr. Mayers that we could only buy bonds that they would agree to repurchase."

Further questions were propounded and answers made, which are pertinent:

"Q. What, if anything, did you tell Mr. Mayers at that time about interest?

A. Well, that we couldn't invest our money in something that only paid three or four per cent, because we were paying four per cent. on our time deposits.

Q. (Page 52) Was there any reason why you, Mr. Lamb, on behalf of the Scioto Bank was interested in buying these particular bonds?

A. It was represented to us by Mr. Mayers that they were guaranteed by the State of Louisiana.

Q. (Page 54) What else, if anything, at this time when you were negotiating for the purchase of these bonds with Mr. Mayers did Mr. Mayers say to you about these particular bonds?

A. That they were sound."

As we have heretofore indicated, no claim is made by Mr. Peters in his deposition that any statement was made to him or to him and Mr. Lamb to the effect that the defendant bank would repurchase the bonds. The record is silent as to any statement or act of Mr. Mayers that would in any wise indicate acquiescence in an agreement or understanding that his bank would repurchase the bonds, unless it is found in the written agreements.

It develops that the bonds paid a rate of interest sufficient to meet the desires of the plaintiff and that it was represented that their payment was assured by the State of Louisiana. It is reasonable to assume that these considerations were the impelling cause of the purchase of the bonds. In view, then, of the language employed in plaintiff's exhibits A and B, can it be said that the requisite proof appears, that upon the execution of these agreements the minds of the parties met upon a repurchase agreement which was carried into the writings? We are of opinion that (1) the proof is entirely too meager to support such finding and (2) granting the good faith of all parties in the transactions involved requires an inference that may not safely be indulged, in the light of all the facts in this case.

It is our conclusion that the judgment in this case is manifestly against the weight of the evidence and must be reversed.

BARNES, PJ, and BODEY, J, concur.